

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| TAMIMI GLOBAL COMPANY, LTD., ) <br> ) <br> Plaintiff, ) <br> ) <br> -v- ) <br> ) <br> DYNCORP INTERNATIONAL, LLC ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 1:13-cv-802 |

## MEMORANDUM OPINION

Before the Court are the parties' cross-motions for summary judgment. The Court finds that there are no genuine issues of material facts and, for the reasons stated below, each motion should be granted in part and denied in part.

## BACKGROUND

This case highlights the myriad challenges that arise when private companies contract with the government to support military personnel deployed in a combat zone. The Plaintiff, Tamimi Global Company ("Tamimi"), is a Saudi Arabian limited partnership with its principal place of business in Al-Khobar, Saudi Arabia. The Defendant, DynCorp International ("DynCorp"), is a private military contractor with its principal place of business in Falls Church, Virginia. In 2009 the United States Air Force hired DynCorp as the general contractor to support the 332nd Expeditionary Force Squadron at Joint Base Balad in Iraq. DynCorp then hired Tamimi in July 2010 as a subcontractor to provide dining services at nine dining facilities, commonly referred to as DFACs. Although Tamimi's actual performance as subcontractor began in July, the parties did not execute their formal agreement until December 14, 2010. *See*

1

Subcontract Agreement 10-AFCAP-402-S001, Dkt. No. 32-1, Exh. A [hereinafter "the Subcontract"].

The executed Subcontract was based on a "Performance Work Statement" created by the government, which had been provided to DynCorp in April of 2010. *See* Performance Work Statement, Dkt. No. 32-4, Exh. D [hereinafter "the PWS"]. As dictated by the PWS, the Subcontract included three distinct phases. First, there was a one-month mobilization period from July 26, 2010 to August 25, 2010. During this month Tamimi was to take over the operation of different DFACs by immediately assembling its own operational capacity while simultaneously gradually beginning its provision of food services. The second contract period included eleven months of DFAC operation running from August 26, 2010 to July 27, 2011. These eleven months were referred to as the "base period." Finally, the third contract period provided an option to extend the Subcontract through July 27, 2012. Taken together, the Subcontract covered one year of services (mobilization plus base period), with the option of a second twelve months of service (option period). Article 4 of the Subcontract sets forth the initial prices associated with each of these three periods. It includes $205,556.31 for the mobilization period, $17,012.051.39 for the base period, and $18,550.723.64 for the option period. This schedule of fees was taken from the bid Tamimi presented to DynCorp prior to being awarded the Subcontract.

Under Article 8 of the Subcontract, Tamimi was to submit invoices to DynCorp each month pursuant to the fee schedule. As is to be expected at a wartime military base, the needs of the troops stationed at Joint Base Balad were constantly changing. The Subcontract therefore included mechanisms that helped the parties appropriately respond to the Air Force's fluctuating demands. In particular, Article 9 of the Subcontract governed "changes/modifications." Under

this section, changes to Article 4 were required to be in signed writing, which the parties referred to as change orders. Through these change orders, DynCorp was able to "at any time. . . make changes [to the Subcontract which included] the amending, addition, or deletion of services scope or period of performance." *See* Subcontract at § 9.4. Any executed change orders became binding modifications to the Subcontract.

In practice, the way these seemingly complex contractual provisions operated together was simple. The government informed DynCorp of its needs, which DynCorp communicated to Tamimi. After Tamimi performed, it would submit an invoice pursuant to Article 8, at which point DynCorp would pay Tamimi. If the invoice did not match the Schedule of Fees from Article 4, DynCorp would create a change order as dictated by Article 9. Once the change order was signed, it created a permanent modification to the Subcontract.

Realities on the ground in Iraq necessitated adjustments almost as soon as performance of the parties' agreement began. The costs associated with the mobilization period included hiring employees to manage the DFACs. Tamimi expected that a large number of these employees would already be in Iraq. *See* Deposition of Norm Napier, Dkt. No. 32-2, Exh. B at 64. This was not the case. As a result, Tamimi was forced to hire employees from other countries and fly them to Joint Base Balad by the planeload.

Once its employees were in place, Tamimi began to provide food services pursuant to the transition period schedule mandated by the PWS. Because of the importance of feeding the troops, Tamimi provided food services for approximately four months before the Subcontract was executed. During this four month period Tamimi submitted invoices to DynCorp through a process similar to that outlined in what would eventually become Article 8 of the Subcontract.

On September 8, 2010, Tamimi submitted Invoice #001. *See* Dkt. No. 36-5, Exh. E. This invoice covered July 26, 2010 to August 31, 2010. The invoice included both the operational costs of mobilizing and the transition period food services, and requested payment of over one million dollars for five weeks of service. In response, DynCorp requested Tamimi re-submit the invoice to alter the dates so they corresponded exactly to the mobilization period. Tamimi complied and created a new invoice covering July 26, 2010 to August 25, 2010.

DynCorp received this updated invoice, but again ordered Tamimi to amend it, asking Tamimi to submit one invoice for mobilization operational costs and another for transition period dining services. Tamimi complied and submitted two different invoices. The first, Invoice #001A, requested $292,212.81 for "mobilization transition." The second, Invoice #001B, requested $562,928.00 for DFAC services. *See id.* In accordance with DynCorp's instructions, each invoice covered the one month mobilization period to the day.

On December 17, 2010—several months after performance began, and after this back-and-forth over the invoices with Tamimi—DynCorp's executive finally executed the Subcontract. Performance under the Subcontract appears to have run smoothly from the date of execution until the summer of 2011, when the drawdown of American troops in Iraq led to the closure of numerous DFACs. Eventually, in September of that year, all of the pertinent DFACs were closed and performance on the Subcontract came to an end. *See* Dkt. No. 32-13, Exh. M.

Just as Tamimi had to mobilize to perform the Subcontract, termination of performance required Tamimi to demobilize. Tamimi thus incurred demobilization costs for the process of removing equipment and returning personnel to their home countries. When it placed its bid in 2010, Tamimi estimated its future demobilization costs would be $845,390.00. For the purposes of its bid, Tamimi amortized this estimate over a twenty-three month period, combining the

expected demobilization expenses with the costs of operating each DFAC over the base and option periods.

Given the structure of the Subcontract, the problem with Tamimi's amortization approach should be clear; the agreement never guaranteed performance for more than twelve months. In June of 2011, when the government began to close certain DFACs covered by the Subcontract, Tamimi issued invoices that included the unbilled, amortized demobilization charges. DynCorp passed these charges to the government. The government paid DynCorp, who subsequently paid Tamimi. In the fall of 2011, the remaining DFACs covered by the Subcontract were closed and Tamimi was forced to fully demobilize.

Around the same time, the parties executed a series of change orders, including Change Order No. 3, which was dated October 13, 2011 and included an order date of January 13, 2011. *See* Dkt. No. 28-4, Exh. 4. Of importance for this controversy, that change order considerably altered Article 4's schedule of fees. This modification included an increase to the cost of mobilization from $205,556.31 to $2,261,119.41. Change Order No. 3 also modified the Subcontract so that it included an extra $438,500.44 in demobilization costs. *Id.* These changes were again included in the next Subcontract alteration, Change Order No. 4. *See* Dkt. No. 28-5, Exh. 5. Under the explicit terms of both the Subcontract and the individual orders themselves, these changes represented binding modifications to the parties' agreement.

Between the time Tamimi issued its June 2011 invoices and when the change orders were executed in October, the Air Force employee overseeing the government's prime contract with DynCorp changed. When presented with the modified demobilization amounts from the change orders, the new Air Force contract manager requested additional documentation showing the actual costs of demobilization. Tamimi was unable to provide this documentation to DynCorp.

As a result, the government refused to pay the modified demobilization costs, which in turn prevented DynCorp from paying this amount to Tamimi.

On May 16, 2013, Tamimi filed a complaint in the Circuit Court of Fairfax County, Virginia. *See* Complaint, Dkt. No. 1-2. Based on the facts above, the complaint alleges that DynCorp breached the Subcontract and owes Tamimi $1,036,796.44 as a result. On June 28, 2013, DynCorp removed the case to this Court and a jury trial was scheduled for May 12, 2014. After conducting discovery, the parties filed cross-motions for summary judgment. The Court heard argument from the parties on March 21, 2014, after which the matter was taken under advisement. A few weeks later, the parties notified the Court of their desire to move the trial date to September in order to allow additional time for arbitration, among other things. The Court granted this request and rescheduled the jury trial for September 22, 2014. *See* Dkt. No. 42.

There has been no indication that the parties have settled the matter. Having reviewed the pleadings and record at length, and having determined the matter is appropriate for summary judgment, the Court now issues this opinion resolving the dispute.

## DISCUSSION

### I. Standard of Review

Summary judgment should be granted where the evidence in the record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court explained, "this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute over an issue of material fact is

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Finally, in making a summary judgment determination, the Court must view the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

The Court agrees with the parties that this contract dispute raises questions of law that are appropriate for summary judgment. *See, e.g., Frahm v. United States*, 492 F.3d 258, 261-62 (4th Cir. 2007) ("The interpretation of a contract is a question of law" (citing *Scarborough v. Ridgeway*, 726 F.2d 132, 135 (4th Cir. 1984))). *See also C.F. Garcia Enter. v. Enter. Ford Tractor*, 253 Va. 104, 107, 480 S.E.2d 497, 498-99 (1997) (same).

## II. Choice of Law

The agreement governing this dispute includes a choice of law provision. Under that provision, the Subcontract is to be "construed and interpreted according to the US federal common law of government contracts... To the extent that the US federal common law of government contracts is not dispositive, the laws of the Commonwealth of Virginia shall apply." *See* Subcontract Art. 19. Both the federal common law of government contracts and Virginia law have a favorable view of choice of law clauses, which is only overcome in unusual circumstances. *See Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (citing *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)); *Colgan Air, Inc v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (citing *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999)). There are no such unusual circumstances in this case. Therefore the Subcontract will primarily be interpreted under the federal common law of government contracts and, when need be, under the state laws of Virginia.

## III. Analysis

Tamimi raises one count of breach of contract asserting that DynCorp has failed to pay it $1,036,796.44. *See* Complaint, Dkt. 1-2 at ¶ 15. To recover, Tamimi must show that (i) a contract existed between the parties; (ii) it performed under the Subcontract; (iii) DynCorp breached its duties under the Subcontract; and (iv) it suffered actual damage as a result of DynCorp's breach. *See Car Pool LLC v. Hoke*, Case No. 3:12-cv-511, 2012 WL 4854652 at *3 (Oct. 11, 2012) (citing *Filak v. George*, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004)).

This singular breach of contract claim can be broken down into two separate and distinct allegations. The first is Tamimi's contention that DynCorp failed to pay $562,928.00 for food services provided during the mobilization period. The second is Tamimi's contention that DynCorp must pay it over $400,000.00 in demobilization costs. Each claim is addressed in turn.

The dispute over what Tamimi is owed for its services during the mobilization period stems from a number of discrepancies. These include, but are not limited to, discrepancies between the schedule of prices in the Subcontract, the invoices produced by Tamimi, and the change orders executed by both parties. Many of these inconsistencies are understandable since the Subcontract was designed to be flexible and capable of responding to changing realities on the ground in Iraq. Not all of these variations have the same legal relevance, however, and the task for the Court is to determine what the parties' obligations were under their agreement.

For the most part, DynCorp urges the Court to resolve Tamimi's mobilization claim by looking exclusively at the four corners of the Subcontract. DynCorp thus relies on the well-settled principle that, "when contract terms are clear and unambiguous, a court must construe them according to their plain meaning." *See Bridgestone/Firestone, Inc. v. Prince William Square Assoc.*, 250 Va. 402, 407, 463 S.E.2d 661, 664 (1995) (citations omitted). Under this

axiom, the Court is not to insert a condition "which the parties omitted from their contract by design or neglect." *Id.* Rather, "a court must construe the words as written and not make a new contract for the parties." *Id.* (citing *Berry v. Klinger*, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983)).

With these baseline rules in mind, DynCorp admonishes the Court to look no further than Article 4 of the Subcontract, under which Tamimi was to be paid $205,556.31 during the mobilization period. Tamimi asserts that the mobilization cost schedule in the Subcontract solely reflected operational costs and does not account for the actual food services provided during the mobilization period. DynCorp does not debate this, but claims that Tamimi's failure to include food services in the mobilization period line item within the schedule of fees does not change the terms of the agreement. Rather, in DynCorp's view, this omission is a unilateral mistake and its only duty is to pay the price listed in Article 4. The problem with this interpretation is that it fails to account for the multiple change orders executed by the parties after the Subcontract was formed.

As described above, Article 9 of the Subcontract allowed the parties to modify the terms of the agreement by executing change orders. These change orders provided the necessary dynamic mechanism for which the parties could adjust the Subcontract terms to better reflect the needs of the forces stationed at Joint Base Balad. Unsurprisingly, and appropriately, the parties relied on these change orders to frequently amend the terms of the Subcontract. Under the change orders, the price for mobilization was adjusted from $205,556.31 to $2,261,119.41. As both Article 9 of the Subcontract and the clear language of the change orders demonstrate, these orders reflected a binding modification to the parties' agreement. Consequently, the logical

conclusion of looking solely at the "clear and unambiguous" terms of the agreement, as DynCorp urges, is that Tamimi is owed $2,055,563.10.

DynCorp seeks to avoid this result by arguing that the modified mobilization cost expressed in the multiple change orders is nothing more than a mistake. At oral argument DynCorp insisted that the mobilization cost increase in the change orders was nothing more than a "typographical error" and "some sort of scrivener's error."[1] DynCorp thus puts itself in the puzzling position of arguing that the Court should not pardon Tamimi's apparent omission but should simultaneously excuse DynCorp's admitted error. Such a cherry-picked approach cannot be maintained. Rather, the fact that both parties claim error or omission forces the Court to go beyond the expressed terms in the agreement and consider the doctrine of mutual mistake.

In limited circumstances a court may reform a contract to correct a mutual mistake. *See Cross v. Bragg*, 329 Fed.App'x 443, 454 (4th Cir. 2009) (citing *Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.*, 624 F.2d 513, 518 (4th Cir. 1980)). Under this doctrine, reformation is only available where the language of a contract "in whole or in part fails to express the agreement because of a mutual mistake of both parties as to the contents or effect of the writing." *Id.* (citing Restatement (Second) of Contracts § 155 (1979)). When such a failure exists, the law allows the Court to alter an instrument so that it reflects the true intention of the parties. *Id.* (citing Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 70:9 (4th ed. 2003)).[2]

The record clearly indicates the mobilization costs listed in Article 4 and the change orders embodied a mistake by each party. As a result, the parties' signed and binding writings do

---

[1] DynCorp's contention stems from an argument that the $2,055,563.10 increase is the result of inadvertently misplacing the decimal from the $205,556.31 amount listed in the original Subcontract.

[2] The doctrine of mutual mistake is similarly applied under Virginia state law. *See, e.g., Ward v. Ward*, 239 Va. 1, 5, 387 S.E.2d 460, 462 (1990).

10

not reflect their true intentions. Both parties meant for their agreement to match the work schedule provided by the government in the April 21, 2010 PWS. Section 10.2 of the PWS indicated that Tamimi would provide food services for a portion of the transition period, which ran from late-July to late-August of 2010. When the parties entered into their agreement, they both understood that Tamimi would not be providing these services for free. Prior to executing the Subcontract, Tamimi repeatedly showed DynCorp invoices which reflected the $562,928.00 cost for food services during the mobilization period. On multiple occasions prior to entering the Subcontract DynCorp asked Tamimi to adjust the form of its accounting, but never once indicated that the actual amount invoiced was inappropriate. When the parties finally executed the Subcontract in December of 2010, both misunderstood how the transition period food services—which had already been provided—were being accounted for in the schedule of fees. *See* Dep. of Norm Napier, Dkt. No. 34-2, Exh.2 at 81-84 (Tamimi executive noting how each party misunderstood the assumptions the other was making about the mobilization period). *See also* E-mail from Karen Faunce, Dkt. No. 34-7, Exh. 7 (DynCorp employee noting the same).

Tamimi failed to grasp that it was required to bill separately for food services during the mobilization period. DynCorp knew Tamimi requested $562,928.00 for those services and never questioned the appropriateness of that amount when Tamimi invoiced it, yet DynCorp did not understand that Article 4 of the Subcontract failed to adequately capture that amount. As a result, the parties realized the need to modify the agreement to remedy this mistake.[3] In their haste to deal with a host of other continuous modifications, neither party properly accounted for the actual invoicing of the transition period food services in the subsequent change orders.

---

[3] The only conceivable reason the parties would agree to modify the price of the mobilization period, which had passed and which was fully-performed, is that they both understood that Article 4 did not properly reflect the value of those services. While DynCorp presents convincing argument as to why the amount articulated in the change order was a mistake, it cannot present any argument rebutting the need for the modification in the first place.

With all of this considered, the Court finds that the parties' true intent was for Tamimi to provide food services during the transition period on the schedule articulated by the government's PWS. DynCorp understood that Tamimi was charging for both these food services and the operational costs associated with mobilizing employees to staff the dining facilities. Just days prior to executing the Subcontract, DynCorp accepted an invoice for these services. That invoice appears to be the clearest contemporaneous embodiment of the parties' intent. Therefore, the Court reads the agreement as placing a duty on Tamimi to provide transition period food services and DynCorp a corresponding duty to pay $562,928.00 for those services. Tamimi performed. By failing to compensate Tamimi for these services, DynCorp breached the agreement. Tamimi suffered damages in the amount of $562,928.00 as a result. DynCorp must remedy this breach by making the required payment.

Tamimi contends that DynCorp has also failed to pay over $400,000 in demobilization costs. Tamimi amortized its anticipated demobilization costs over twenty-three months. The Subcontract unambiguously states that services would be provided for the transition period and an additional eleven months. In addition, the Subcontract included an option for an additional twelve months. By amortizing its expected demobilization costs over a twenty-three month period, instead of twelve or fewer months, part of the amortized costs extended into a period for which the parties' agreement guaranteed neither service nor payment. This marked a clear mistake by Tamimi. For a number of reasons, the legal remedies for this demobilization mistake differ from those available to Tamimi for its mobilization cost error.

First, this was a unilateral mistake. A court may reform a contract in light of a mutual mistake but, absent fraud by the other party, no such power exists when a mistake is one-sided. *See Cross*, 329 Fed.App'x at 453-55; *see also Langman v. Alumni Ass'n of Univ. of Virginia*, 247

Va. 491, 503, 442 S.E.2d 669, 677 (1994) (citing *Chang v. First Colonial Sav. Bank*, 242 Va. 388, 392, 410 S.E.2d 928, 930 (1991)). Second, there was no way for DynCorp to be aware of this error. This is in stark contrast to the transition food services omission, for which DynCorp had repeatedly seen invoices requesting amounts the parties failed to articulate in the Subcontract. Third, even to this day Tamimi cannot definitively say how much money it spent on demobilization. *See, e.g.*, Deposition of Badar Manzoor, Dkt. No. 32-3, Exh. C. at 103:14-24.

This does not end the matter. As should be clear at this point, the parties understood the fluid nature of the Subcontract would result in frequent modifications. Just as they did with the transition period food services, the parties executed change orders to modify the agreement. Of relevance for this claim, Change Order No. 3 modified the Subcontract to add $438,500.44 in demobilization costs.

Section 9.5 of the Subcontract addresses the change order process and states the following:

> If any [change order] causes an increase in the costs of or time required to perform this Subcontract, [Tamimi] may submit a request for equitable price adjustment for increase costs. The proposal must have full cost/price support documentation to justify the request. [Tamimi] understands that any increase. . . is subject to approval and funding by [the government]. Payment(s) for increased price(s) cannot be made prior to [the government] providing [DynCorp] with adequate funding to cover the increased scope.

This section mandates that Tamimi's ability to collect on change order increases is contingent on DynCorp's ability to be paid those increases by the government, which in turn depends on whether or not the government has approved the modified expense. These contractual requirements defeat Tamimi's claim for demobilization costs.

DynCorp has stated that if it is paid by the government for the increased demobilization costs reflected in Change Order No. 3, it will pay Tamimi. *See, e.g.*, Deposition of Aubrey Mitchell, Dkt. No. 28-9, Exh. 9. Tamimi must provide DynCorp with certain documentation for

13

this to happen. Tamimi has failed to do so. Accordingly, under the clear terms of the agreement, this failure removes DynCorp's duty to pay for the increase in demobilization costs.[4]

Even if Tamimi were to prove DynCorp breached some contractual duty by failing to pay for the increased demobilization costs, the record before the Court would still not support Tamimi's demobilization claim. As previously stated, Tamimi cannot show what its actual demobilization costs were. It likewise has presented no evidence of whether the payment it actually received for demobilization was higher or lower than what it expended. In fact, there is no indication that Tamimi has actually suffered any harm from DynCorp's failure to pay the demobilization costs outlined in Change Order No. 3. Consequently, Tamimi's attempt to collect additional demobilization costs is also defeated by its inability to prove damages. *See Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 156, 671 S.E.2d 132, 136 (2009) (failure to prove damages warrants dismissal of a breach of contract claim (citing *Filak*, 267 Va. at 619-20, 594 S.E.2d at 614-15)).

## CONCLUSION

For the reasons stated above, Tamimi is entitled to recoup $562,928.00 plus interest for transition period food services, but is not entitled to recover additional funds for demobilizing.[5]

A corresponding order shall issue.

/s/
Liam O'Grady
United States District Judge

July 30, 2014
Alexandria, Virginia

---

[4] The parties spend considerable time debating whether the Subcontract was terminated for convenience and therefore whether certain Federal Acquisition Regulations (FARs) apply. Certain FARs may present an alternative basis under which Tamimi had an obligation to provide documentation prior to receiving payment, but the Court does not reach this issue. Rather, the Court's reading of the requirements placed on Tamimi ends with the application of Section 9.5 of the Subcontract.

[5] Under both federal common law and Virginia state law it is within the Court's discretion to award pre-judgment interest. *See Norfolk & Portsmouth Belt Line R. Co. v. M/V MARLIN*, Case No. 2:08-cv-134, 2009 WL 336983 (E.D. Va. Oct. 9, 2009); *Sun Trust Mortg. Inc. v. United Guar. Residential Ins. Co. of North Carolina*, 809 F.Supp.2d 485, 492-93 (E.D. Va. 2011). As noted in the corresponding Order, the Court will award two years of pre-judgment interest at the Virginia statutory rate, which is 6% *per annum*.